### Application of FLORIDA POWER CORPORATION.

Railroad & Public Utilities Commission.

July 23, 1953.

K. E. Fenderson and S. E. Simmons, both of St. Petersburg, for applicant.

Lewis Petteway, general counsel for commission, Fred Pettijohn, director of commission's accounting department, Fred Romig, commission accountant, and P. M. Schuchart, director of commission's public utility department, all of Tallahassee, appearing on behalf of the commission and the public.

Edwin A. Whitnel, St. Petersburg, for Pinellas Utility Board and as a protestant.

B. H. Overton, St. Petersburg, for St. Petersburg Chamber of Commerce.

J. N. Helpbringer, St. Louis, Mo., for City Products Corp., protestant.

F. E. Harrison, Tallahassee, for State Road Department and state institutions and tuberculosis hospitals.

Chairman JERRY W. CARTER, Commissioner RICHARD A.' MACK and Commissioner WILBUR C. KING each participated in the hearings and disposition of this case.

BY THE COMMISSION.

*Nature of Proceeding*

This proceeding concerns an application filed in the above entitled matter by Florida Power Corporation on December 29, 1952 for authority to adjust its rates and charges now in effect for electric service furnished by the company in this state so as to establish and put into effect a uniform schedule of rates sufficient to yield a fair rate of return upon the value of the company's prop-

erty devoted to the public use. The applicant further prays that the fuel and commodity clauses now in effect as part of its rate structure be confirmed with such modifications as may appear just and equitable; that the amount recorded in the company's books under account 100.5 be approved as a prudent investment and together with account 252 properly includable in the company's rate base and that appropriate adjustment of operating expense be provided for amortization thereof; and that the rates now applicable to customers in and about Madison, Monticello, and Perry and originally promulgated by Florida Power & Light Co. (the former owner of the electric utility properties in said cities) be revised to conform to applicant's tariff of charges for its other consumers of like service throughout the company's system.

On January 12, 1953 the commission issued an order providing for a public hearing on the reasonableness of applicant's various proposals. The first hearing was held in St. Petersburg on February 10 and 11, 1953. The second hearing was likewise held in St. Petersburg on March 16 and 17, 1953 and the final hearing was held in Tallahassee on April 27, 1953. Written briefs were filed and oral arguments were heard by the commission on May 21, 1953. Prior notice of each hearing was given by newspaper advertisement in each county where applicant sells and distributes electrical power.

### Territory Served

The applicant, Florida Power Corporation, is a Florida corporation with its principal place of business in St. Petersburg. It is an integrated public utility engaged in the business of generating, purchasing, transmitting, distributing and selling electric energy and for that purpose owns and operates steam, internal combustion engine and hydraulic generating plants, substations, transmission lines and distribution systems. Except for a transmission line extending across and 48 miles beyond the Florida Georgia state line and connecting with the transmission facilities of the Georga Power Co. near Barneyville, Georgia, the company operates wholly within the state of Florida and serves approximately 152,000 customers in an area of about 20,600 square miles with a population of approximately 700,000 people, including 96 incorporated cities and towns, and more than 150 unincorporated communities and extensive rural territory. The region encompassed by the company's operations commences at the Florida Georgia state boundary line near Jasper, Florida, extends westward to the town of Chattahoochee in Gadsden County, southwesterly to Port St. Joe and vicinity, south along the gulf coast of Florida to St. Petersburg and through the central part of Florida to the Avon Park-Lake Placid

vicinity embracing 31 counties, viz: Alachua, Bay, Citrus, Columbia, Dixie, Franklin, Gadsden, Gilchrist, Gulf, Lafayette, Lake, Leon, Levy, Madison, Marion, Orange, Osceola, Pasco, Pinellas, Polk, Seminole, Sumter, Suwannee, Taylor, Volusia, and Wakulla.

### Commission Jurisdiction

Under chapter 366, Florida Statutes 1951, this commission has exclusive jurisdiction over the rates and charges of public utilities as defined therein. Chapter 366 became a law on May 9, 1951 and for almost one year thereafter some question existed concerning our jurisdiction over the rates charged by the applicant utility for services rendered to its customers in Pinellas County. At the time said chapter became a law there was in existence in Pinellas County a local regulatory agency created by special act of the legislature with jurisdiction over the rates and charges of Florida Power Corporation insofar as its operations within Pinellas County were concerned. After its creation the Pinellas Utility Board determined that the rates charged by the applicant within Pinellas County were unreasonably high and ordered a reduction in said rates. The utility attacked the validity of the board's order in the circuit court of Pinellas County, and pending the completion of that litigation was allowed to collect on an escrow agreement the higher rates which the board had found to be unreasonable. The circuit court sustained the rate order of the board and the applicant appealed from that decision to the Supreme Court. During the pendency of that litigation there was collected under the escrow agreement from Pinellas County customers approximately one and a quarter million dollars in excess of the rates found to be reasonable by the board. While this matter was pending before the Supreme Court, the utility applied to this commission for authority to increase its rates and charges in Pinellas County. In our order no. 1757, dated January 31, 1953, we expressed the opinion that the litigation which was pending between the utility and the board constituted a serious impediment to a sound and successful financing program and handicapped the utility in bringing to present and prospective customers in Pinellas County (and elsewhere in its territory) the type of service which was being demanded and to which the public was entitled. We recognized that we had no authority to require the corporation to dismiss its appeal in the Supreme Court, but we did strongly suggest that its obligation to the public required that it immediately terminate its litigation with Pinellas Utility Board and devote its efforts and abilities toward the completion of its expansion program so that service could be improved and new customers given the service to which they were entitled. Following our sug-

gestions, the corporation dismissed its appeal in the Supreme Court and refunded to its Pinellas customers approximately one and a quarter million dollars. When the corporation dismissed its appeal, all litigation concerning the rates established by the board was thereby terminated and all rights, powers, duties, and jurisdiction of Pinellas Utility Board concerning rates and charges for electric energy in Pinellas County ceased to exist. Our own jurisdiction over said rates then became exclusive and absolute. Pinellas Utility Board has ceased to exist except for the purpose of winding up its affairs and is not a proper party either in support of or in opposition to proposed rate adjustments in the county where it formerly exercised regulatory powers. We have received and filed in this proceeding the voluminous records compiled by the board in its investigation of electric rates and charges in Pinellas County. We have, however, given said records no consideration in the determination of this cause. Public utility operation in Florida is not in a static condition. Records of such operations compiled several years ago are now obsolete and completely valueless in a rate proceeding such as this. We have received these records and will preserve them for their historical interest and value, but we find them to be of no help in our present investigation of applicant's rates and charges.

### Unit for Rate Making

In fixing the rate base and in determining the cost of service, we have considered all of the property and all of the operations of the company. We have treated as a single unit all the business of the company and have not segregated the property employed and the costs incurred in connection with the company's operations within local political subdivisions. Normally, the unit for rate-making purposes should be the entire interconnected operating property of the utility without regard to geographical or political subdivisions. Exceptional circumstances may require or permit the segregation and fixing of a smaller unit. Whether such exceptional circumstances exist is a matter to be determined by the administrative body in the exercise of its sound discretion. From a social and economic standpoint, the use of the entire property of the applicant seems sound. The company is an integrated public utility and electric energy generated by one of its powerhouses may be transmitted and delivered to any point within the whole system. An emergency shutdown or failure in one part of the system may be met by electric current generated elsewhere in the integrated system. A segregation under such circumstances would be purely artificial and, in part at least, arbitrary. In this case neither reason nor expedience imposes any obligation upon this commission to treat local geographical or political subdivisions as separate units

for ratemaking purposes. The law requires no such separation and the facts do not disclose any exceptional circumstances which would justify the use of arbitrary and artificial bases in this proceeding. The Pinellas Utility Board, in fixing the present electric rates in Pinellas County, was functioning under a special law which established Pinellas County as a separate unit for ratemaking purposes. That special law, however, is no longer in effect but has been supplanted by a general law which provides for statewide regulation of electric public utilities. The failure of the Florida legislature to preserve Pinellas County as a separate unit for ratemaking purposes when it adopted statewide regulation in place of local regulation leads inevitably to the conclusion that the legislature intended that this commission should consider the entire property of a utility as the unit for ratemaking purposes.

## The Rate Base

Before rates can be fixed, we must first determine the rate base. In this phase of the ratemaking process the legislature has charted a very clear and specific course for us to follow. The statute provides that we shall investigate and determine the actual legitimate costs of the property of each utility company, actually used and useful in the public service, and keep a current record of the net investment of each company in such property—which value shall be used for ratemaking purposes and shall be the money honestly and prudently invested by the company in such property used and useful in serving the public, less depreciation, and shall not include any good will or going-concern value or franchise value in excess of the payment made therefor. Having established the theory upon which the rate base is to be predicated, as well as the component factors to be given consideration in such determination, it then becomes necessary to determine the date to be used to establish the rate base.

In normal times and under stable conditions the amount of revenue required to produce a fair rate of return can generally be calculated accurately and equitably upon the average and not the year-end balances of the test year. On the other hand, where a utility is in the throes of unusual growth and confronted at the same time with constantly increasing investment and operating costs, conventional notions of ratemaking must be adjusted to the circumstances and this is especially true where net earnings fail to keep pace with heavy additions made and to be made in plant investment. Where there is little fluctuation in a utility's investment accounts from the beginning to the end of the year, we believe that the rate base should be predicated upon the net average investment for the test

period. We have followed that method consistently for many years and will continue to do so whenever and wherever the investment accounts disclose nothing more than a normal growth. In the present case, a net average investment rate base for the test year 1952 would be 76 million dollars in round figures whereas the utility at the end of 1952 had more than 95 million dollars invested in electric plant. If we use the average investment for the year 1952 in determining the rate base, we would assume an investment level that is more than a year old. Such a rate base would bear no relationship to the actual conditions as they now exist. There seems to be only one sound objection to the use of the year-end rate base and that is that some additional revenues must be ascribed to plant additions, however, this would be largely offset by the factors of additional depreciation, taxes, and expenses, so that there is little, if any, danger of excessive compensation. Under present conditions, as disclosed by the record herein, we conclude that the year-end rate base is more realistic than the average investment rate base. Inasmuch as we are here fixing rates for the present and for a reasonable time in the future, we should not use an investment figure that is already more than a year old. During a period of rapidly rising prices and plant expansion, it is difficult, in proceedings of this nature, to determine an adequate and reasonable rate base. We must be fair to the public and exercise our ratemaking power in such a way that the public is protected against exorbitant or unreasonably high rates. At the same time, the interest of the utility, and those who invest in its securities, must also be protected against non-compensatory rates. At best there is always a delay or regulatory lag of several months between the time a utility applies for a rate increase and the time a regulatory agency is able to make its final decision on the application. Even though the regulatory agency should determine that the utility was entitled to an increase in its rates at the time of the application, nevertheless, the rates could not be made retroactive and the utility would be deprived of the increased revenue during the months required to process the application. If such losses incurred through the regulatory lag are further augmented by the adoption of an average investment rate base which coincides with an investment level more than a year old, then the utility becomes the victim of confiscation—it cannot successfully sell its securities to raise the capital with which to finance its expansion program; customers are unable to secure adequate service; prospective customers are unable to secure any service; and the public suffers. In the present case we have adopted a year-end base constructed as shown on

64

Exhibit A—

| Rate Base | As of December 31, 1952 | |
|---|---|---|
| | Dr. | Cr. |
| Electric plant in service | $ 95,786,746 | |
| Construction work in progress — Completed and in service | 281,588 | |
| Construction work in progress — No interest capitalized | 302,432 | |
| Plant held for future use | 6,699 | |
| Total electric plant | 96,377,465 | |
| Less reserve for depreciation | 11,520,075 | |
| Total electric plant less depreciation reserve | 84,857,390 | |
| Working capital — | | |
| Cash working capital | 1,572,696 | |
| Fuel | 728,787 | |
| Prepayments | 219,809 | |
| Customers advances for construction | | 54,085 |
| Contributions in aid of construction | | 244,555 |
| Customers' deposits | | 744,583 |
| Federal income tax accrual | | 395,050 |
| | | 1,468,273 |
| Rate Base by balance | | 85,910,409 |
| | $ 87,378,682 | $ 87,378,682 |

The applicant contended for a year-end rate base of $90,884,861 constructed as shown on Exhibit B—

| Rate Base | As of December 31, 1952 |
|---|---|
| Electric plant in service | $ 95,786,746 |
| Construction work in progress — Completed and in service | 281,588 |
| Construction work in progress — No interest capitalized | 302,432 |
| Electric plant acquisition adjustments | 1,197,865 |
| Materials and supplies — General | 3,228,545 |
| Materials and supplies — Fuel | 815,846 |
| Prepayments | 219,809 |
| Cash working capital | 1,622,296 |
| Plant held for future use | 6,699 |
| Sub-Total | $103,461,826 |
| Less: Retirement work in progress | —— |
| Reserve for depreciation | $ (11,520,075) |
| Reserve for amortization of A/C 100.5 | (758,250) |
| Customers' advances for construction | ( 54,085) |
| Contributions in aid of construction | (244,555) |
| | $ (12,576,965) |
| Rate Base | $ 90,884,861 |

( ) Denotes red figures

The principal difference in the company's rate base and the one we have adopted lies in the allowance for working capital and the treatment of electric plant acquisition adjustments. We have eliminated $1,197,865—which represents the electric plants acquisition adjustments—as not being a proper item to be included in the rate base. This item represents essentially the difference between (1) the amount of money actually paid for electric plant purchased and (2) the original cost of such plant when it was first dedicated to the public service. The inclusion of this item in the rate base has not, in our opinion, been justified.

### Working Capital

Working capital is an element of value to be considered in arriving at a proper rate base. The various current accounts carried as working capital generally are intended to fulfill four principal functions, namely—to meet current bills, to provide a stock of materials and supplies, to have a sufficient cash reserve to meet emergencies, and to preserve the company's credit standing. It is the amount of cash necessary for the safe and convenient transaction of a business, having regard to the owner's ordinary outstanding accounts, both payable and receivable, the ordinary condition of the stock or supplies on hand, the natural risk of the business, and the condition of its credit. The allowance generally should be sufficient to furnish a public utility with funds to meet current operating bills when due, and provide for a stock of necessary materials and supplies to be used in the upkeep of the business. Because of the general functions to be fulfilled by working capital, it is customary to relate this item to operating expenses when determining the amount to be allowed in the rate base. In our computation of working capital we have allowed $1,572,696 for cash working capital, $728,787 for fuel, and $219,809 for prepayments, making a total of $2,521,292. However, we have offset against that amount certain sums which the company has at its disposal and which it may use in lieu of working capital, to-wit—customers' advances for construction, $54,085; contributions in aid of construction, $244,555; customers' deposits, $774,583; and federal income tax accrual for one half of one quarter, in the sum of $395,050. The net amount then included in the rate base for working capital is the sum of $1,468,273. Thus we have arrived at a rate base of $85,910,409—against which the earnings of the company are to be tested for the constructed year.

### Rate of Return

The determination of a fair and reasonable rate of return is one of the most important and complex problems in a rate case. The

more important factors entering into such a determination are general economic conditions, the ability of the utility to attract capital, the current cost of money, the financial history of the utility, the risk involved, comparisons with other enterprises of a similar nature, and efficiency of management.

We will not give here a detailed discussion of our consideration of these and other factors entering into this phase of the case; however, it is common knowledge that during the past several months the cost of capital has steadily increased. Interest rates in the money markets of the country are considerably higher now than one or two years ago when a return of 6% was considered by most regulatory agencies as sufficiently high for a public utility. At the present time a return of only 6% would not appear to be fair and reasonable for a public utility which is engaged in a tremendous expansion program which must be financed by the issuance and sale of large amounts of bonds and stocks of the utility. In view of the current cost of capital and the condition of the money market today, concerning which there appears to be no immediate prospect for improvement, a rate of return of something in excess of 6% but less than 6½% would, in our opinion, be reasonable for an electric public utility having a financial history and expansion program similar to the applicant.

Florida Power Corporation serves some of the fastest growing portions of the state. Florida is commonly recognized as one of the two or three fastest growing states in the entire country. Industrially Florida is developing at an amazing rate and most of this industrial development is taking place in territory served by the applicant in this proceeding. The applicant is engaged in an expansion program which requires the investment of some 20 to 25 million dollars annually in additional generating, transmission and distribution facilities in order that the constantly increasing demands of the public for more and more electric energy can be adequately and efficiently met. Because of its past financial history which involves depressed earnings over a period of several years the applicant is at least one financing behind the schedule which was reasonably required to meet the increased public demand for electric energy in its territory. Present earnings of the company are not sufficiently high to support its expansion program. The utility must attract more capital if it is going to meet its obligations to the public and provide, within the territory professed to be served by it, adequate service for all those reasonably entitled thereto. If the utility is unable to meet these obligations, then the public cannot be served and the public interest and the public welfare suffer. While we would be the last to increase rates and charges which the public

must pay for essential services, nevertheless, we will not contribute to the slowing down of the growth and industrial development of this great state by closing our eyes to the reasonable needs of those public utilities which are attempting to render essential services to the public. Such a policy would not only violate the constitutional rights of the utilities, but would constitute a great disservice to the public by depriving it of the service to which it is entitled.

Giving due and careful consideration to the many factors involved, it is our opinion that rates and charges which will yield a rate of return in excess of 6%, but somewhat less than 6½%, on the rate base hereinbefore approved, will be fair and reasonable and, under present conditions and for a reasonable time in the future, sufficient to enable the company to serve its existing debt, attract the additional capital it needs to finance its expansion program, and provide reasonable earnings for the holders of its common stock.

### Additional Revenue Requirements

During the constructed year ended December 31, 1952 applicant received total gross operating revenues in the sum of $26,390,826. If this actual revenue were adjusted to show rates and charges in Pinellas County on the same level as the remainder of the system the total gross operating revenues would have been $27,544,313. This adjusted revenue figure should be further adjusted by deducting $5,000 to show the annual effect of revenue deductions caused by fixing the rates and charges in the Madison, Monticello and Perry area at the system level, and by deducting the sum of $60,000 to show the annual effect of revenue deductions caused by a new contract between the applicant and certain rural electric cooperatives. These revenue adjustments leave total gross operating revenues in the sum of $27,657,566.

Applicant's operating and maintenance expenses for the constructed year ended December 31, 1952 were $14,857,217. We have adjusted these by adding thereto the sum of $235,000 to show the annual effect of wage increases granted in July 1952. Depreciation expenses for the constructed year were $2,143,278. Taxes other than federal income were $1,154,035 but we have adjusted these by adding thereto the sum of $132,674 to show the annual effect of an increase in ad valorem taxes, increased workmen's compensation insurance and additional taxes under the state's public utility gross receipts tax, making total taxes (other than federal income) in the sum of $1,286,709.

In our opinion, applicant will require a rate of return of 6.45% on our rate base of $85,910,409 in order to pay its operating and

maintenance expenses, taxes, depreciation expenses, debt service—and provide a fair and reasonable return for its common stockholders.

After giving full consideration to the adjusted revenues and adjusted expenses for the constructed year, we have calculated that a return of 6.45% on the rate base of $85,910,409 would require federal income tax allowance in the sum of $3,594,141. When this allowance for federal income tax is added to the adjusted expenses aforesaid and the result deducted from the adjusted gross revenues of $27,657,566, the remainder will be the applicant's net operating income in the sum of $5,541,221—which represents a return of 6.45% on the rate base we have found as the reasonable value of applicant's property devoted to the public service. It is our opinion that this net operating income in the sum of $5,541,221 which represents a rate of return of 6.45% on the rate base of $85,910,-409, will be sufficient to enable applicant properly to maintain its property, to attract the additional capital it requires to continue its expansion program, and to render an adequate and efficient service to the public.

In order to receive a return of 6.45% of said rate base, it will be necessary for applicant utility to adjust its rates and charges so as to produce gross operating revenues in the sum of $27,657,566 on the basis of its 1952 operations.

Applicant has contended for two further adjustments in its operating expenses. First, it contends that the annual effect of losses sustained through the inequities of its fuel adjustment clause was $275,000 for the constructed year ended December 31, 1952. The automatic fuel adjustment clause then in effect was voluntarily adopted by the utility and while it did nothing more than recover for the utility the actual increases in the price of fuel from time to time it failed to recover the cost of the fuel when the price thereof declined. For that reason the company has proposed a revised fuel clause which will protect the company against the fluctuations in the cost of oil. The $275,000 loss sustained in 1952 then becomes a non-recurring loss which should not be taken into consideration in fixing rates for the future.

The applicant also contended that it suffered a $25,000 loss through the increased cost of maintenance and materials. We do not consider that this is a proper item to be considered in fixing rates for the future.

### Uniform Rates

While the construction of rates so as to produce the revenues approved by the regulatory agency is a matter initially for manage-

ment and this commission should refrain from fixing the exact type of rate unless discrimination exists, nevertheless we are of the opinion that uniform rates throughout an integrated system are desirable and should be adopted in the absence of a strong showing that rate differentials are justified in the various territories served. Much of what we have previously said in this order regarding the proper unit for ratemaking is equally applicable to the question of uniform rates. The difficulties attendant upon making approximately accurate allocations and fixing fair or satisfactory zone or other rate differentials should not be undertaken unless there are such differences in circumstances and conditions between different parts of the territory served by an integrated electric utility as to justify a departure from uniformity. We find nothing in this record upon which we could base the separations and allocations which would be necessary if rate differentials are to be established for different territories. Giving consideration to all of the facts disclosed by this record, we are of the opinion that the applicant should put into effect a uniform scale of rates and charges for similar service throughout its entire system.

### *Industrial Rates*

Industrial rates maintained by the applicant have been the result of private contract between the utility and the industrial users of electric energy furnished by the applicant. These contracts were entered into prior to the time jurisdiction over electric rates was given to this commission. While said contract rates were, and still are, valid they are subject to our jurisdiction and control and may be changed by order of the commission wherever justification therefor exists. The record here discloses that increased operating costs have not been reflected in these industrial rates. We recognize, of course, that large industrial users of electric energy make it possible for an electric utility to expand its facilities so that domestic and other customers of the utility may have more efficient and economical service. Industrial rates, however, should bear their fair share of increased costs. Some, if not all, increases in operating costs are related to the generation, transmission and distribution of electric energy for industrial use. It is our opinion that the record herein discloses conditions and circumstances that require some portion of the increases herein authorized to be reflected in an upward adjustment of the applicant's existing industrial rates.

In adjusting its industrial rates upward, however, the utility should bear in mind the fact that some of its industrial customers are located in territory that might be served by other electric

utilities. An industrial customer desiring to change from one utility to another in order to take advantage of a better contract industrial rate would, of course, be confronted with the necessity of having the new contract rate approved by this commission. It is not likely that we would, in the absence of judicial coercion, require one utility to increase its industrial rates and then approve lower industrial rates for a competitive utility. Applicant, however, should bear in mind this potential competitive situation in adjusting its industrial rates upward as directed herein.

### Findings of Law and Fact

Based upon the entire record herein, the commission finds that:

1.  The commission has absolute and exclusive jurisdiction over the rates and services of Florida Power Corporation throughout its entire system.

2.  The applicant's entire property should be considered as a single unit for ratemaking purposes without segregation as to geographical or political subdivisions.

3.  The 1952 year-end rate base of $85,910,904, as previously discussed herein and as shown in Exhibit A, represents the fair and reasonable value of applicant's property used and useful in serving the public and upon which it is entitled to earn a fair and reasonable return.

4.  A return of 6.45% per annum on the utility's year-end rate base of $85,910,904 will be fair, reasonable and compensatory and should be sufficient for the present and for a reasonable time in the future to enable it successfully to finance the continuation of its expansion program.

5.  Total gross operating revenue in the sum of $27,657,566, based on its 1952 operations, will be required to give the utility a net operating income of $5,541,221, or a return of 6.45%, on said rate base of $85,910,904.

6.  Applicant should put into effect throughout its entire system a uniform scale of rates and charges for similar service eliminating any discriminations or inequities that may exist in its presently effective rates and charges.

7.  Applicant's industrial rates should bear their fair share of the increased cost of operation and should be adjusted upward to attain that end giving due regard to any competitive situation that may exist because of the ability of other utilities to serve applicant's industrial customers.

8. Applicant should prepare and file with the commission for its consideration and approval a schedule of rates and charges which, together with such fuel and commodity adjustment clauses as applicant may propose and which may be approved by the commission, will produce, on the basis of applicant's 1952 operations, total gross operating revenue in the sum of $27,657,566, said schedule and adjustment clauses, if approved, to become effective as to all bills rendered by applicant on and after August 1, 1953.

9. Jurisdiction over the subject matter of this proceeding and the parties herein should be retained by the commission for a period of 30 days from the date hereof for the purpose of entering such other and further order or orders as may be necessary or appropriate in the premises.

Now, therefore, in consideration thereof, it is ordered, adjudged and decreed that—

1. The findings of law and fact as hereinbefore set forth, together with the discussion of the various elements and factors involved as contained in the body of this order, be and the same are hereby approved in every respect.

2. Florida Power Corporation shall forthwith prepare and file with this commission for its consideration and approval such schedule of rates and charges, and fuel and commodity adjustment clauses, as may be necessary and appropriate to produce the gross operating revenues herein found to be necessary and reasonable.